Filed 1/27/14  In re Edward P. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re EDWARD P., a Person Coming Under the Juvenile Court Law. | B247168 |
| | (Los Angeles County Super. Ct. No. CK96814) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TERESA V.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Terry T. Truong, Court Commissioner.  Affirmed and remanded.

Janice A. Jenkins, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Stephen Watson, Senior Associate County Counsel, for Plaintiff and Respondent.

Edward P., born in September 2008, is the child of Teresa V. (mother) and Edward A. P. (father).[1] On January 23, 2013, the juvenile court declared him a dependent of the court and ordered him placed with father. Mother appeals from this order, contending that the dependency petition does not state a proper basis for jurisdiction, substantial evidence did not support the juvenile court's findings, and the court failed to order compliance with the inquiry and notice provisions of the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.)

We conclude that the petition alleges a basis for jurisdiction and substantial evidence supports the juvenile court's findings. We therefore affirm the court's exercise of jurisdiction. However, because the juvenile court erred in concluding that ICWA did not apply, we remand so that proper ICWA notice may be given.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Detention

Edward came to the attention of the Department of Children and Family Services (DCFS) on November 23, 2012, when it received a referral alleging that father had been arrested for choking mother in Edward's presence. DCFS detained Edward on November 29, 2012, and filed a detention report on December 5, 2012. The report stated as follows:

Mother told a children's social worker (CSW) that she and father had been in a relationship for six and a half years but were not married. They currently live together with Edward and a roommate. Mother admitted having been diagnosed a year earlier with depression and prescribed Zoloft, but denied any medical problems, substance abuse, or criminal history. She said Edward attended daycare and was receiving therapy for a speech delay.

---

[1]     Edward's four half-siblings (mother's older children through two different fathers) are either living with their respective fathers or are no longer minors. They are not part of this dependency proceeding.

2

Mother reported that father became abusive with her when he learned she was pregnant with Edward and his abusive behavior was escalating. Father reportedly was physically abusive about once per week. Mother said father had choked her, dragged her by her hair, slapped her face, pushed her, punched her in the face, and screamed in her face. She reported sustaining black eyes, bruises, and scratches. Mother said Edward often got between his parents during incidents of violence, trying physically to push father away.

Mother reported that the most recent incident of domestic violence had been the previous day, when father accused her of being under the influence of alcohol. Father grabbed her by the neck, pushed her against a closet, and choked her. Mother believed father would kill her and was truly afraid of him for the first time in their relationship. When father stopped choking her, mother told him she was going to call the police. He followed her and punched her in the face in Edward's presence. Mother fell backward into the pantry and hurt her left arm. Edward was crying and screaming "stop" and "mommy" and tried to push father off her. Mother called the police, who arrested father.

Father denied any history of mental illness, substance abuse, or domestic violence. He said Edward had been living with him since May 2009, and mother moved in with them in September 2012 because she was homeless. Prior to moving in with him, mother had been living in a house where her housemates abused alcohol and drugs, and father believed mother began to abuse alcohol while living in that environment.

Father said he and mother had not been in a relationship for many years, and he was pressing mother to move out of the home. He described mother as a chronic liar and, as an example, recalled that mother claimed to have been dying of leukemia to manipulate father into staying with her. Father moved multiple times but mother "manages to show up each time and manipulate her way back into his life." He believed mother was making false accusations against him because he recently told her he would be formally seeking custody of Edward.

Father believes mother is an alcoholic and drinks while caring for Edward. He knows she is drinking because she has alcohol on her breath, slurs her words, and

3

becomes angry. Father reported that mother hides her alcohol use, but that he has found empty or partially empty bottles of tequila and vodka. Two weeks before, he had called mother and she sounded "out of it." He returned home and found mother in bed with Edward next to her, crying in the dark. Mother was slurring her speech and was unable to get out of bed, and father therefore believed her to be intoxicated. Father took Edward to paternal grandmother's home against mother's wishes.

The previous day, father and mother had been arguing via text message. Mother's messages began not to make sense and father suspected she was intoxicated.[2] When he got home, he could smell alcohol on mother's breath and mother was slurring her words. He accused mother of drinking while caring for Edward. Father said mother was so intoxicated that she stumbled backwards and hit herself on the wall. Mother followed him and punched him in the throat. He put his hands out in self-defense and does not know if he hit mother in the process. Mother called the police and father was arrested for domestic violence. Father denied ever being physically abusive with mother, but said mother often tries to hit him when she is intoxicated.

Paternal grandmother said father was not physically violent with mother and had tried to help mother out of love for Edward. She believes mother has serious mental health issues and is a pathological liar. In the past, mother had told father she was dying of leukemia and went to a cemetery to pick out a casket and flowers. Paternal grandmother said mother is always on the phone or watching television while with Edward, but that father is very engaged with Edward.

Paternal uncle Isaac P. and paternal aunt Jaclyn P. both said they spent a lot of time at mother and father's home. They reported that mother was constantly on the phone and watching television while ignoring Edward's needs. Neither had observed any domestic violence between mother and father. Isaac said he had seen mother buy 80 ounces of beer and had been present two weeks earlier when mother appeared intoxicated while caring for Edward.

---

[2]     The CSW reported that she observed mother's "text messages on father's phone, which were very consistent with father's statements."

Maternal grandmother Lucy D. reported that mother had been a "pathological liar" since she was a child. Mother had been sexually abused at eight years old and received four years of therapy before beginning to accuse other relatives of sexual abuse. She described mother as a "good liar" because she is very believable. Mother has "been dying of leukemia 'for fifteen years'" and "will shave her head . . . in order to fake going through chemotherapy." She said mother is obsessed with father and shows interest in Edward only when father is around. Maternal grandmother fears mother will hurt Edward to get attention and keep father involved with her.

According to maternal grandmother, mother is an alcoholic and has abused alcohol for 18 years. On several occasions, mother was so intoxicated she fell and injured herself. Further, when mother's other two children were young, grandmother "would show up to the home unannounced at four in the afternoon to find the children in the living room unsupervised and eating cereal out of a box while mother was 'stone drunk' in her bedroom sleeping. She reported that the home would look as though a 'tornado' hit it. She reported that, additionally, mother would have no reservations about driving the children while drunk. In regards to physical abuse, maternal grandmother reported that she has directly observed mother 'yank' the children's arms and scream at them. She reported that mother has a 'short temper.' . . . In regards to domestic violence, maternal grandmother reported that she does not believe mother's accusations of domestic violence by [father]. . . . She reported, to the contrary, she has directly witnessed mother hit [father] while drunk. She reported that mother became angry and threw a glass at him in front of the children. She reported that mother will curse at, push and try to [provoke] father to react. She reported that [father] would respond by leaving the home. She reported that father is a 'quiet' person who does not like confrontation."

George S., the father of two of mother's older children, said mother is a good mother and he does not know her to be an alcoholic or drug abuser.

When reinterviewed, mother admitted that she had told father she was dying of leukemia. She did not remember going to Forest Lawn to make funeral arrangements. She said she had been homeless and did "what she had to do" to get what she needed.

5

When she was a child, maternal grandmother was rarely around and the only way to get her attention was to "say that I was sick." She said maternal grandmother has mental health issues and had been arrested for child endangerment. Mother denied lack of interest in Edward.

A "Last Minute Information for the Court," dated December 4, 2012, stated that father and mother's roommate, Charles H., reported that mother and father argued frequently, but he had not observed any domestic violence. On November 22, 2012, mother knocked on his door to say father had hit her and to ask if she should call the police, but he did not see any injuries. Charles believes mother takes good care of Edward and never observed her intoxicated while caring for Edward. He said father frequently accused mother of being under the influence of alcohol.

On December 5, 2012, father filed a parental notification of Indian status which stated that father's great-grandfather was a Saboba Cahuilla Indian.

## II.     Petition

On December 5, 2012, DCFS filed a juvenile dependency petition that alleged as follows: "a-1," "b-1": Mother and father have a four-year history of engaging in violent altercations in Edward's presence. In November 2012, father grabbed mother's neck, choked mother, and struck mother's face with his fists. "b-2": Mother has a history of substance abuse and is a current abuser of alcohol, which renders her incapable of providing regular care of Edward. On prior occasions in 2012, mother was under the influence of alcohol while Edward was in her care. Father knew of mother's alcohol abuse and failed to protect Edward. "b-3": Mother has a history of mental and emotional problems and has failed to take her psychotropic medication as prescribed, which renders her incapable of providing regular care of Edward. Father knew of mother's mental and emotional problems and failed to protect Edward.

6

## III.    Detention Hearing

The court held a detention hearing on December 5, 2012, at which time both parents denied the allegations of the petition.  Further, mother's counsel said that mother had fabricated the allegations of physical abuse by father:  "Your Honor, mother would like to apologize to the court.  The information that led to the domestic violence allegations in (a)(1) and (b)(1) are completely fabricated.  Mother and father have been in the process of ending their relationship [for] some time.  They did get into a heated argument.  Mother chose at that time to call the police and make false statements in her emotional state."

The court found that continuance in the parents' home was contrary to Edward's welfare, substantial danger existed to his physical or emotional health, and there were no means by which he could be protected without removing him from his parents' physical custody.  The court therefore ordered Edward detained and ordered DCFS to provide reunification services to both parents.  After learning that the only alleged Indian heritage was through Edward's great-great-grandfather, the court stated that ICWA did not apply.

## IV.    Jurisdiction/Disposition

DCFS filed a jurisdiction/disposition report on January 23, 2013.  It stated that the CSW had interviewed mother on January 7, 2013, at which time mother reported that she had attended two parenting classes and two anger management classes.  Edward and father had not been interviewed.  The caregiver reported that mother was visiting Edward each week for two hours.

The court held a contested jurisdictional hearing on January 23, 2013.  Father testified at the hearing that he had never been physically abusive with mother and was not aware of her mental health problems or alcohol abuse when he was romantically involved with her.  He said that in 2006 and again in 2007, mother told father she was dying of leukemia and took him to a cemetery "[t]o prepare for the inevitable."  Father said he had never engaged in or been accused of domestic violence in any previous relationship.

7

Father testified that he and mother lived together intermittently between 2006 and 2010. In September 2012, he allowed mother to move into his house because she claimed she would otherwise be homeless. Mother and father were not romantically involved at that time. Father said he first saw mother under the influence of alcohol about two weeks before November 22. He never saw mother under the influence of drugs or alcohol in front of Edward.

Father said on November 22, 2012, he had Thanksgiving dinner with his family and then returned home. Mother was upset and she and father argued. Mother struck father, and father defended himself: "As she went to hit me, I went away and pushed her back in defense." Mother fell back into the pantry. Father was arrested following this incident but was never charged.

Father testified that mother struck him on three separate occasions. The first time was in 2010. Mother "came at me, hit me on my chest. I don't know how to describe it. It wasn't like a boxer punching me, but it was, you know, (indicating), out of anger, frustration. She's a lot smaller than me; so it didn't really [faze] me or strike me as her, like, beating me up. So I just felt it best to walk away." The second incident took place the same month, when father suggested they should no longer live together. Mother "would get angry, verbal argument. And probably within the week's time of the first incident, the second incident happened. Just, again, another argument. Frustration. Pounding on my chest. Me leaving to go to work." The third incident was November 22, 2012. Father took Edward to his parents' house for Thanksgiving and spent a few hours there. Edward said he wanted to go home to mother, so father took him home and then returned to his mother's house. Mother "proceeded to text me and call me, angry that I did drop off my son with her, that she felt that I should have spent more time with him. I then stayed at my mom's house. A few hours later [I] went home. [Mother] was upset about a misunderstanding about a cell phone incident, saying that I'd 'boughten' [a] cell phone for somebody else that she knew about. I told her that I didn't really feel like fighting anymore, because, again, she had already been arguing with me over the phone. I walked away into my bedroom. My son followed me. She was yelling at my face.

8

Very upset, crying, pointing to my face. She made a fist up like she was going to hit me. I leaned back and I told her, 'Don't.' She stepped back. She stumbled over something[, k]nocked over a fan, tripped into the closet. I got up, walked into the kitchen. She then followed me into the kitchen. I said something to her along the lines of — I want to say about being a bad parent or — or — or having an alcohol problem. I don't really remember exactly what I said. The only reason I know I said something to affect her was because I saw her get angry. She charged at me, made a punch motion at me. I moved. The punch landed on my throat. I pushed her back. She went back into the pantry then proceeded to look for her phone to call the police."

Father said he never hit or slapped mother, pulled her hair, or choked her. He saw her intoxicated only a handful of times. He never believed she had an alcohol problem or a mental health problem.

Mother conceded during her testimony that she had falsely claimed to have leukemia. Initially, "I said it out of desperation to get attention from my parents. It just kind of carried over into my personal life." She said father hit her at least 15 times. The first time was in 2007, when she told him she was pregnant with Edward. He "slapped me in the face, pushing me across our living room. I fell into a couch we had against the wall. My back hit the back of the couch and broke the decorative part of the bottom of the couch." On other occasions, father slapped her, pushed her, or held her down. Mother said she never hit father, although she did push him away in self-defense.

After hearing argument, the court sustained paragraph b-2 of the petition (mother's alcohol abuse and father's failure to protect) and dismissed the remaining allegations. It declared Edward a dependent of the court, ordered him removed from mother, and released him to father. It ordered family maintenance services for father and family reunification services for mother, including an alcohol treatment program with testing, mental health counseling, a psychiatric evaluation, and monitored visitation.

Mother timely appealed.

## DISCUSSION

Mother contends:  (1) as amended, the dependency petition fails to state a cause of action under Welfare and Institutions Code, section 300, subdivision (b);[3] (2) there is insufficient evidence to support a finding that Edward is a dependent child; and (3) the juvenile court failed to comply with ICWA.  We address these issues below.

### I.        Mother's Challenge to the Sufficiency of the Petition Is Moot

Section 300, subdivision (b) provides:  "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  . . . The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

Mother contends that paragraph b-2 of the petition does not state a cause of action under section 300, subdivision (b), because it does not allege Edward was at risk of serious *physical* harm as a result of mother's substance *abuse*.[4]  For the following reasons, we do not agree.

---

[3]      All further unidentified statutory references are to the Welfare and Institutions Code.

[4]      As amended, paragraph b-2 of the petition states:  "[Mother] has a history of substance abuse and is a *user* of alcohol, which renders the mother incapable of providing regular care of the child.  On prior occasions in 2012, the mother was under the influence of alcohol, while the child was in the mother's care and supervision.  The child's father

10

A challenge to the sufficiency of a dependency petition is treated as a demurrer. (*In re James C*. (2002) 104 Cal.App.4th 470, 480; *In re Nicholas B*. (2001) 88 Cal.App.4th 1126, 1133; *In re Alysha S*. (1996) 51 Cal.App.4th 393, 397.)  A reviewing court "construes the well-pleaded facts in favor of the petition and determines whether a basis for jurisdiction is stated.  [Citations.]  In the dependency scheme, the petition is examined for whether essential facts have been pleaded which establish 'at least one ground of juvenile court jurisdiction.'  [Citation.]" (*In re James C*., *supra*, at p. 480.)

This court has previously held that a parent may not challenge the sufficiency of allegations in a dependency petition if he or she did not raise the issue in the dependency court.  (*In re Christopher C*. (2010) 182 Cal.App.4th 73, 82, citing *In re Shelley J*. (1998) 68 Cal.App.4th 322, 328-329, *In re James C*., *supra*, 104 Cal.App.4th 470, and *In re S. O*. (2002) 103 Cal.App.4th 453.)  In the present case, it is undisputed that mother did not challenge the sufficiency of the petition in the juvenile court, and thus she has forfeited her right to do so here.

Even if mother had adequately preserved a challenge to the sufficiency of the petition, we would still reject mother's argument because it is moot.  "'"[I]f the jurisdictional findings are supported by substantial evidence, the adequacy of the petition is irrelevant." [Citation.]' ([*In re N.M*. (2011) 197 Cal.App.4th 159,] 166, fn. omitted.)  'The only exception occurs when a parent claims a petition fails to provide actual notice of the factual allegations.  Unless the alleged factual deficiencies result in a miscarriage of justice, the reversal of a jurisdictional order supported by substantial evidence is unwarranted.' (*In re Javier G*. (2006) 137 Cal.App.4th 453, 458-459.)" (*In re John M*. (2012) 212 Cal.App.4th 1117, 1123.)

In the present case, mother does not claim that the petition failed to provide her actual notice of the factual allegations against her, nor could she reasonably do so.  The original petition alleged that mother is a "current abuser" of alcohol, which rendered her

---

. . . knew of the mother's alcohol abuse and failed to protect the child.  Such alcohol abuse on the part of the mother and the father's failure to protect the child endangers the child and *places the child at risk of harm*."  (Italics added.)

11

incapable of providing regular care of Edward, and that mother's alcohol abuse endangered Edward's "physical health and safety and places the child at risk of physical harm, damage and failure to protect." The amended petition altered some of the language of the original petition, alleging that mother is a "user" of alcohol, which rendered her incapable of providing care for Edward, and that mother's "alcohol abuse" endangered Edward "and places the child at risk of harm." Although the amended petition does not track the statutory language as closely as the original petition had done, it clearly put mother on notice that her alcohol use was alleged to place Edward at risk and to provide a basis for juvenile court jurisdiction. On these facts, mother cannot persuasively argue she had prejudicially inadequate notice of the allegations against her. (See *In re John M.*, *supra*, 212 Cal.App.4th at p. 1123 ["Here, the court amended the petition at a fairly late stage in the proceedings. Although the language became less specific, by the time of the hearing the petition was accompanied by several DCFS reports. Under these circumstances, mother cannot argue she had prejudicially inadequate notice of the allegations against her."]; *In re Athena P.* (2002) 103 Cal.App.4th 617, 627-628 ["[Mother] does not claim the petition gave her prejudicially inadequate notice of the factual allegations against her. If the evidence at the jurisdictional hearing was insufficient, [mother] can seek reversal on that ground. But if the evidence was sufficient to support the juvenile court's findings, any failure of the petition to state a cause of action became harmless error."].)

II.     **The Evidence Was Sufficient to Support the Court's Exercise of Jurisdiction Over Edward**

Mother contends that the evidence before the juvenile court was insufficient to support its exercise of jurisdiction over Edward. We do not agree.

Jurisdiction based on "the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse" requires evidence that the parent at issue is a substance abuser. (§ 300, subd. (b).) Here, there was substantial evidence of mother's substance abuse, in the form of statements by father, maternal

grandmother (who said mother is an alcoholic who has abused alcohol for 18 years), and the paternal uncle.

There also was substantial evidence that mother's alcohol abuse caused her to be unable to care for Edward. Father testified that mother drank alcohol while caring for Edward, and he knows she is drinking because she slurs her words and he can smell alcohol on her breath. Father described an incident in mid-November 2012, the same month Edward was detained, in which he returned home to find mother intoxicated and Edward crying. Mother was slurring her words and unable to get out of bed. Two weeks later, when mother was caring for Edward, father received text messages from mother that did not make sense. When he returned home, mother was slurring her words and father could smell alcohol on her breath. Father said she was so intoxicated that she fell backwards and attempted to assault him. The paternal uncle also reported that he had seen mother intoxicated while caring for Edward in mid-November 2012, and maternal grandmother said mother was sometimes so intoxicated she fell and injured herself.

Mother points to other evidence in the record suggesting that she does not abuse alcohol, namely, the roommate's statement that he never saw mother intoxicated and the CSW's observation that the family home appeared clean and orderly and there was no evidence of drugs or alcohol. In reviewing a challenge to the sufficiency of the dependency court's jurisdictional findings, however, "our power begins and ends with a determination as to whether substantial evidence exists, *contradicted or uncontradicted*, supporting the dependency court's determinations." (*In re Noe F*. (2013) 213 Cal.App.4th 358, 366, italics added.) "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193.) "'"We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]"'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Viewing the evidence through this lens, we necessarily conclude that

13

substantial evidence supported the trial court's finding that mother abused alcohol and that her alcohol abuse put Edward at future risk of serious physical harm.

**III.    The Juvenile Court Erred in Failing to Order DCFS to Give ICWA Notice**

Mother contends, and DCFS agrees, that the juvenile court erred in declining to order DCFS to give notice as required by ICWA.  For the reasons that follow, we agree.

Congress passed ICWA in 1978 "to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children 'in foster or adoptive homes which will reflect the unique values of Indian culture . . . .'" (*In re Levi U.* (2000) 78 Cal.App.4th 191, 195; 25 U.S.C. § 1902.)  The party seeking termination of parental rights must notify the Indian child's tribe of the pending proceedings and its right to intervene.  (*In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1164; 25 U.S.C. § 1912(a).)

"The right of a tribe to intervene would be meaningless without notice. Accordingly, the ICWA provides:  'In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.  If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe.  No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary . . . .'  (25 U.S.C. § 1912(a).)  In 2007, the California Legislature enacted provisions consistent with the ICWA.  (See § 224 et seq.)" (*In re Gabriel G.*, *supra*, 206 Cal.App.4th at p. 1165.)

In the present case, the juvenile court concluded that ICWA notice need not be given because the claimed Indian heritage was through Edward's paternal great-great-

14

grandfather. This was error. "'The determination of a child's Indian status *is up to the tribe*; therefore, the juvenile court needs only a suggestion of Indian ancestry to trigger the notice requirement.' [Citations.] 'Given the interests protected by the [ICWA], the recommendations of the [federal] guidelines, and the requirements of our court rules, the bar is indeed very low to trigger ICWA notice.' (*In re Antoinette S*. (2002) 104 Cal.App.4th 1401, 1408 [finding father's suggestion that child 'might' be an Indian child because paternal great-grandparents had unspecified Native American ancestry was enough to trigger notice].)" (*In re Gabriel G.*, *supra*, 206 Cal.App.4th at p. 1165, italics added.)

The present case is analogous to *In re S.E.* (2013) 217 Cal.App.4th 610, where the child's mother contended that DCFS's failure to state the name of the child's great-great-grandfather in its ICWA notice rendered such notice inadequate. DCFS disagreed, contending that it had no obligation to include information about ancestors as remote as great-great-grandparents in ICWA notices, as evidenced by the fact that there is no designated space for such ancestors on ICWA notice forms promulgated by the Judicial Council of California. We disagreed: "Although we are sympathetic to DCFS's contention that Mother's objection will result in regrettable delay in the proceedings, we cannot say that the failure to thoroughly investigate the child's Indian heritage constitutes harmless error. The information which was omitted here pertained directly to the ancestor Mother and the maternal grandmother affirmatively claimed was Indian. Under these circumstances we cannot say that the omission was harmless and that providing the ancestor's name might not have produced different results concerning the child's Indian heritage." (*Id*. at p. 615.) We therefore remanded the case to the juvenile court with directions to order DCFS to provide notice to the relevant tribes that included the name and any identifying information for the child's great-great-grandfather. (*Id*. at p. 616.)

As in *In re S.E.*, Edward's claimed Indian heritage is through a great-great-grandparent, and there is no information in the record concerning the relevant tribe's membership requirements. The juvenile court therefore erred in concluding that Indian

heritage through a great-great-grandparent was insufficient to trigger ICWA notice requirement.

This court follows the rule that when there is a failure to follow ICWA procedures before disposition, all jurisdictional and dispositional orders remain in effect while there is a limited remand to the juvenile court for DCFS to give ICWA notice. We therefore remand the present case with directions to the juvenile court to comply with the notice requirements of ICWA. If, after proper ICWA notice is given, Edward is determined not to be an Indian child, prior defective notice becomes harmless error. Alternatively, if after proper ICWA notice Edward is determined to be an Indian child, mother can petition the juvenile court to invalidate orders that violate ICWA. (*In re Damian C.* (2009) 178 Cal.App.4th 192, 199-200; *In re Veronica C*. (2007) 157 Cal.App.4th 179, 187-188; *In re Brooke C*. (2005) 127 Cal.App.4th 377, 385.)

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed, and the matter is remanded to the juvenile court with directions to comply with inquiry and notice provisions of ICWA. If it is determined that Edward is an Indian child and ICWA

16

applies to these proceedings, mother may petition the juvenile court to invalidate orders that violated ICWA.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.[*]

We concur:

EPSTEIN, P. J.

MANELLA, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17